Filed 11/14/25  P. v. Hartsfield CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEREMY HARTSFIELD,<br><br>    Defendant and Appellant. | B342879<br><br>(Los Angeles County<br>Super. Ct. No. 21HWMH00195) |

APPEAL from an order of the Superior Court of Los Angeles County, Ronald Owen Kaye, Judge.  Affirmed.

Jordan Brown for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

In 2007, Jeremy Hartsfield pled not guilty by reason of insanity to various crimes and was committed to Patton State Hospital. When the People petitioned to extend his commitment, Hartsfield moved to dismiss the petition because he was never advised his commitment could be extended indefinitely. The trial court denied the motion to dismiss the petition and sustained the petition, extending Hartsfield's commitment for two years. Hartsfield appeals, contending that the trial court erred by denying his motion to dismiss and that there was insufficient evidence to support his continued commitment. We reject both contentions and affirm the order.

## BACKGROUND

On August 29, 2007, Hartsfield entered into a negotiated plea under which he agreed to plead not guilty by reason of insanity to a forcible lewd act on a child (Pen. Code,[1] § 288, subd. (b)(1)) and to an attempted lewd act on a child (§§ 664, 288, subd. (a)) and admit a prior strike conviction for a robbery committed when he was a juvenile. Hartsfield was not advised at that plea hearing that his commitment could be extended beyond the original term of commitment. At the subsequent sanity hearing, the court found that Hartsfield was insane when he committed the offenses and committed him to Patton State Hospital for the agreed-upon term of 16 years. He again was not advised that his commitment could be extended indefinitely, beyond 16 years.

On February 17, 2021, the People petitioned to extend Hartsfield's commitment under section 1026.5, subdivision (b). The trial court extended Hartsfield's commitment to June 3,

_____

[1]      All further undesignated statutory references are to the Penal Code.

2023.  At no time during those proceedings did Hartsfield raise any issue regarding the inadequacy of any advisement when he entered the plea.

On March 8, 2023, the People again petitioned to extend Hartsfield's commitment.  While the petition was pending, Hartsfield filed a motion to dismiss the petition on the ground he was not advised when he entered his plea that his commitment could be extended beyond 16 years.  After an evidentiary hearing, the trial court denied the motion to dismiss on March 26, 2024.

The trial court then conducted a court trial on the petition, after which the trial court found beyond a reasonable doubt that Hartsfield was a substantial danger of physical harm to others.  It sustained the petition and extended Hartsfield's commitment for another two years, to July 5, 2025.

## DISCUSSION

I.     Motion to dismiss

It is undisputed that Hartsfield was not advised on the record at the plea and sanity hearings, as required by *People v. Lomboy* (1981) 116 Cal.App.3d 67, 72 (*Lomboy*), that if he entered into the not guilty by reason of insanity plea his commitment could be for life.  He therefore now contends that the recommitment order must be reversed.  We disagree.

A.     *Additional background*

After Hartsfield filed his motion to dismiss the petition under *Lomboy*, the People filed an opposition.  The People argued

3

that the motion was a collateral attack on the plea which should have been raised by a petition for writ of habeas corpus.[2]

At a hearing in February 2024, the trial court said it would determine whether Hartsfield's motion to dismiss was a collateral attack and should "not be in this court." The trial court found that the matter would remain in the mental health court.

At the hearing on the motion to dismiss, the People conceded that Hartsfield had not been advised of the "lifelong consequences" of his plea but argued that Hartsfield suffered no prejudice. Hartsfield and the attorney who represented him during the plea proceedings, Jay Keenan, then testified.

Hartsfield testified that Keenan told him that if he took the plea, "it would be for a package deal, and it would be from six months to 13 years" at Patton State Hospital. Neither Keenan nor the court advised he could be facing a lifetime of commitment extensions. Had Hartsfield known this, he would not have entered into the plea. He first learned he could challenge his plea in 2015 from another patient at Patton, who came across *Lomboy* during research. Hartsfield mentioned *Lomboy* to his then public defender Karl Fenske, but Fenske "denied picking the case up and said that I had waived my rights." Then, when the People filed its first petition to extend his commitment in 2021, he did not raise any *Lomboy* issue with his public defender.

Keenan testified that he recalled discussing the plea offer with Hartsfield. Further, his policy, "even still today, is to go

---

[2]     The People also argued that Hartsfield had waived the issue because he had never raised the *Lomboy* issue during his 16-year commitment or when the People first sought to extend his commitment in 2021. The People do not raise waiver on appeal, and we therefore do not address it.

4

through both the pros and cons of the deal, the consequences." His practice, for nearly 20 years, is to advise every client pleading not guilty by reason of insanity that they may stay in state hospital for the rest of their life. Although Keenan had no independent recollection of telling Hartsfield about this consequence of the plea, his notes reflected that "on August 28th of 2007, I advised him that he could be in Patton State Hospital for the rest of his life, and I memorialized that in my written notes." Keenan said he is "meticulous about writing my notes." Keenan added that Hartsfield seemed to understand what was going on, was clean and "well kept," and asked appropriate questions. Keenan also remembered that Hartsfield said he did not feel it was worth risking 25 years to life at a full-blown trial, and Keenan had agreed.

In ruling, the trial court stated that Hartsfield "seemed very credible that he wasn't advised." However, the trial court also found Keenan credible. So, "ultimately you have two very credible witnesses. But ultimately I think Mr. Keenan's over 20 years of criminal practice and his candor during his testimony, and particularly if Mr. Hartsfield is the moving party, I think was more compelling. So I find it more credible than not that Mr. Keenan apprised Mr. Hartsfield of a potential of a life sentence and the potential for continuing [section] 1026.5 civil commitments. [¶] So based on my review of the record, the testimony and the pleadings, and the transcripts that were provided, I do deny the collateral attack which I will characterize as a habeas petition by Mr. Hartsfield, and I'm prepared to set the matter for trial."

Thereafter, the trial court, in response to a question Hartsfield asked about the ruling, explained that it was not

5

finding Hartsfield had lied or deliberately misrepresented anything. Rather, "I just found Mr. Keenan had established that it would be his practice and that was something that I really found compelling and that he would have told you. You may have forgotten it. I don't know."

B. *Analysis*

A defendant found not guilty by reason of insanity is committed to a state hospital or other appropriate facility for a maximum term of commitment "equal to the longest term of imprisonment for the crimes which could have been imposed had the defendant been convicted *and* sentenced rather than found not guilty by reason of insanity." (*People v. Hernandez* (2005) 134 Cal.App.4th 1232, 1237.) However, if the prosecution proves that the defendant "represents a substantial danger of physical harm to others," then the commitment may be extended for two years, and multiple extensions may be requested. (§ 1026.5, subds. (b)(1) & (b)(8).) Accordingly, a defendant found not guilty by reason of insanity "is subject to possible confinement in a mental institution for the rest of her natural life." (*Lomboy*, *supra*, 116 Cal.App.3d at p. 72.)

A defendant must be advised that a commitment following a plea of not guilty by reason of insanity may exceed the longest possible term of imprisonment for the underlying crime. (*Lomboy*, *supra*, 116 Cal.App.3rd at pp. 68–69.) Failing to give such an advisement may require either voiding the commitment or allowing the defendant to withdraw his plea. (*People v. Minor* (1991) 227 Cal.App.3d 37; *People v. McIntyre* (1989) 209 Cal.App.3d 548.)

Here, the Attorney General acknowledges that Hartsfield was not advised on the record at the plea and insanity hearings

per *Lomboy* but urges us not to consider the claim because it is a collateral attack on the plea that should have been raised in the trial court or on appeal by a petition for writ of habeas corpus. (See generally *In re Robinson* (1990) 216 Cal.App.3d 1510, 1516–1517 [motion to dismiss is a collateral attack on original plea that is not subject to direct appeal from ensuing judgment].) The trial court here treated the motion as a habeas corpus petition, and the order denying such a petition is not appealable. (*People v. Gallardo* (2000) 77 Cal.App.4th 971, 983.) However, we have discretion to deem an appeal from an order denying a petition for writ of habeas corpus to be an original habeas petition filed in this court. (*Id.* at p. 986.) We therefore exercise our discretion and consider the merits of the *Lomboy* issue.

On the merits, the failure to give proper advisements and waivers is reversible if the defendant establishes he was prejudiced, i.e., that he would not have entered the plea had he been properly advised, and the defendant did not enter into the plea voluntarily and intelligently. (*In re Moser* (1993) 6 Cal.4th 342, 352; *People v. Christian* (2005) 125 Cal.App.4th 688, 694–695.)

The trial court here found that Hartsfield was advised he could be committed indefinitely and nonetheless entered into the not guilty by reason of insanity plea. That is, the trial court credited Keenan's testimony that he had advised Hartsfield his commitment could be extended beyond 16 years. Keenan consulted his written notes, which refreshed his recollection that he had told Hartsfield he could be in state hospital for "the rest of his life." And while the trial court also found Hartsfield credible, in that he believed what he was saying, the trial court said that Hartsfield might be misremembering what happened when he

7

discussed the plea with Keenan. Further, Keenan testified that when he discussed the plea and its consequences with Hartsfield, Hartsfield seemed to understand everything. Keenan also said that had he thought Hartsfield was incompetent to enter the plea, he would not have proceeded.[3] These findings therefore show that Keenan advised Hartsfield he was facing lifetime commitment in a state hospital and that Hartsfield understood that advisement. (See, e.g., *In re Robinson*, *supra*, 216 Cal.App.3d at p. 1515 [defendant's testimony, which trial court found credible, established prima facie case for review].)

Hartsfield attacks the trial court's credibility findings as lacking a "reasoned basis" because it deemed both parties credible. However, as we have explained, the trial court found that Hartsfield believed what he was saying, which is different than finding what he said was true. That is, the trial court did not find Keenan failed to give Hartsfield the *Lomboy* advisement. It instead found that Keenan properly advised Hartsfield, stating it found Keenan's description of his work practices and contemporaneous note compelling evidence he complied with *Lomboy*.

The cases Hartsfield cites to show that the trial court's credibility findings are insufficient, *People v. Minor*, *supra*, 227 Cal.App.3d 37 and *People v. McIntyre*, *supra*, 209 Cal.App.3d 548, are distinguishable. In both cases the defendants did not receive *Lomboy* advisements at their plea and insanity hearings. The defendants thereafter moved to dismiss recommitment petitions. Although there were hearings on those motions, nothing in the

---

[3]     Hartsfield does not claim he was incompetent to understand the plea or its consequences; his only claim is he was never told his commitment could be extended indefinitely.

cases suggests that any party introduced evidence that the defendants' attorneys gave them *Lomboy* advisements or to otherwise contradict the evidence that the advisement was not given.  In contrast, Keenan testified here that he advised Hartsfield he could be committed for the rest of his life, and the trial court expressly credited that testimony.[4]

II.    Substantial evidence

Hartsfield alternatively contends that there was insufficient evidence he poses a substantial danger of harm to others.  After summarizing the evidence at the court trial on the petition to recommit Hartsfield, we explain why that evidence was sufficient to support the trial court's order.

A.    *Additional background*

At the court trial on the recommitment petition, multiple doctors testified.

1. *The prosecution's case in chief*

Dr. James Maurer and Dr. Chris Chen testified for the People at the court trial on the petition to extend Hartsfield's commitment.

Dr. Maurer testified that he had been Hartsfield's treating psychiatrist at Patton State Hospital for the past four months, during which time the doctor had met with him formally about five times to do monthly notes and informally two or three times, and the meetings lasted 15 to 45 minutes.  Hartsfield was

---

[4]    Hartsfield also cites *People v. Moore* (1998) 69 Cal.App.4th 183 for the proposition that a counsel's testimony about his general practice, even with notes, is insufficient to prove the client was properly advised.  We are unable to find that case.

9

diagnosed with schizoaffective disorder bipolar type, pedophilia disorder, and cannabis use disorder. Hartsfield had a limited understanding of his mental illness: he either could not remember or understand his symptoms, and he specifically denied having pedophilic disorder. Although the doctor had not observed any positive symptoms of schizophrenia in Hartsfield, Hartsfield had difficulty recognizing things that had happened in the past, which could be a symptom of schizophrenia or partly due to memory impairment. Hartsfield would not go to the sex offender treatment group, saying it did not apply to him and denying that he committed the offenses.

Because Hartsfield did not appreciate his past actions, the doctor believed that Hartsfield's next step would be to listen to the professionals and open up to the possibility he has a serious mental illness and suffers from pedophilic disorder.

The doctor called Hartsfield a "model patient," cooperative, and respectful. He was compliant with taking his medications. However, when asked if Hartsfield could manage his mental illness on his own, the doctor believed that Hartsfield had good intentions, but without "being tested," "it would be difficult to know. And I do have deep concerns based on his lack of insight and seeming lack of memory of his past symptoms and past behaviors."

Next, Dr. Chen, a forensic psychiatrist, testified that she had evaluated Hartsfield three times: in 2021, 2023, and May 2024. During her last evaluation, Hartsfield was calm and cooperative, but he was guarded and minimized his symptoms of mental illness. He denied hearing voices, and the doctor did not observe him talking to himself.

Hartsfield had limited insight and judgment into his illness, saying that he took medication because the doctors gave it to him, and he could not identify his symptoms. But he admitted sometimes being noncompliant with his medications. He also admitted having heard voices 20 years ago, but denied having any symptoms since. Dr. Chen believed that due to Hartsfield's limited insight, he did not understand his symptoms of mental illness, which raised a concern about his ability to be medically compliant.

Although Hartsfield's insight into his schizoaffective disorder had improved since Dr. Chen's first evaluation of him, he said the only reason he was diagnosed with pedophilic disorder was the witness lied, was intoxicated, and was jealous of him. He did not believe he had a disorder, so he refused sex offender treatment.

Hartsfield had a recent incident with a peer. According to Hartsfield, the peer was staring aggressively at him and "was being very direct with his body language," so Hartsfield hit him and held him to the ground.

In the doctor's opinion, Hartsfield did not have the coping skills to manage his pedophilic disorder if he were to be released into the community, and he is a substantial risk of physical harm to others due to his mental illness. She based her opinion on Hartsfield's history of violent behavior and more recent assault on a peer, despite being in a highly structured setting. Further, his limited understanding of his need for psychotropic medications and of his pedophilic disorder showed he will be unable to manage his symptoms outside a structured setting. As he has not addressed his pedophilic disorder, Dr. Chen was

11

concerned he does not have the coping skills to manage his sexually deviant behavior.

2. Defense case

Dr. Kimberly Smith, a clinical psychologist, works at Metropolitan State Hospital, and her job duties include conducting dangerous risk assessments, cognitive assessment, and individual therapy. She assessed Hartsfield with the HCR-20, a dangerousness risk assessment tool. Hartsfield rated at a low risk.

Dr. Smith did not observe any symptoms in Hartsfield, but he reported having occasional auditory hallucinations and mild paranoia. Hartsfield said he understood he had schizoaffective disorder bipolar type, described his past symptoms, and said how he experiences the symptoms now. He last experienced auditory hallucinations, paranoia that people were going to hurt him, talking to himself, and sleeplessness one year ago. Hartsfield agreed he has a mental illness, and that if released into the community he would see a psychiatrist and enroll in treatment groups.

Based on her interview, Dr. Smith opined that Hartsfield had insight into his mental illness. He admitted he had been resistant and angry about his hospitalization, which inhibited his insight. He agreed that his medications keep him calm and mitigate the voices and paranoia. He had been stable for about a year. His plan on leaving the hospital was to seek a psychiatrist or to get his medications delivered. In her opinion, Hartsfield can control his impulses. As to that, he agreed he overreacted when he assaulted his peer, and he should have taken time to think. In the doctor's view, he was not a danger to himself or others.

The doctor did not see his pedophilic diagnosis in the records she reviewed, so she did not ask him about it.

Hartsfield testified. He has had schizoaffective disorder, bipolar type since he was 17 years old, and his symptoms are hallucinations, hearing voices, a little paranoia, and seeing things. The medications help keep his symptoms under control, and he understands he needs them. If he were released from Patton, Hartsfield said he would continue to take his medications and stay in contact with his psychiatrist. He recognized he needs help with his medication and his "living conditions." At Patton, he goes to weight training and a therapeutic community group. While at Patton, he has developed coping skills, like walking the long hallways in the unit while listening to music or drinking liquid and making music. He has not had a counseling session in a while, but he has completed a wellness recovery action plan to help him develop coping skills if released into the community.

Although Hartsfield has not had warning signs that his symptoms are returning, his warning signs are sweaty palms, shaking hands, and a little anxiety. When these things happen, he takes deep breaths and sometimes counts to 10.

Hartsfield disagreed that he has pedophilia or ever committed a sex crime. Instead, it was a "made up thing from someone I knew that had been drinking that night." A long time ago, a doctor told him to fight his case instead of going to groups.

### 3. People's rebuttal evidence

Dr. Johnathan Watson, a clinical forensic psychologist, testified that he is a staff psychologist at Patton State Hospital's sex offender unit. In March 2024, Hartsfield became one of his patients. Hartsfield is prescribed to attend core treatment groups and a sex offender treatment plan program. However,

13

Hartsfield told Dr. Watson that he did not commit a sex offense, so there was no need for him to attend the treatment program. Instead, Hartsfield was focused on legal proceedings. When the doctor advised Hartsfield that his test results corroborated the police report, Hartsfield was respectful but became irritated and frustrated if the doctor probed the issue further and tried to hold Hartsfield accountable. Dr. Watson would like Hartsfield to address his sexual violence risks by enrolling in the treatment program and participating in polygraphs and other testing to assess his sexual preferences and behaviors. Otherwise, Hartsfield was compliant with the treatment plan for his schizoaffective disorder.

Dr. Mario Souza is a senior psychologist in Patton State Hospital's forensic evaluation department and is a certified violence risk assessment trainer. In 2019, he was assigned to Hartsfield's case and has been authoring section 1026.5 reports about him every six months.[5] The doctor reviewed Dr. Smith's assessment of Hartsfield's violence risks and found it notable that she did not evaluate him using tools related to sexual offense recidivism. This would be crucial to understanding whether a patient can manage in a lower level of care or in the community.

Dr. Souza was also critical of Dr. Smith's use of the HCR-20. Although Dr. Smith discussed treatment and supervision, she did not discuss responsivity to treatment, specifically Hartsfield's refusal to attend treatment groups. Also, Dr. Smith said Hartsfield had good insight into his mental illness, but the

---

[5] In his March 2024 report, Dr. Souza referred to incidents of Hartsfield publicly masturbating in front of nonconsenting females at Patton. Dr. Souza was not asked about these incidents.

HCR-20 definition of insight includes insight into violence risk, which is impossible to assess without discussing his offenses. Dr. Smith also said she had reviewed his records, but she did not see that pedophilia was in his chart. In Dr. Souza's opinion, Dr. Smith's failure to review all of Hartsfield's records rendered her assessment about Hartsfield's treatment trajectory concerning.

### 4. Ruling

In ruling, the trial court summarized the doctors' testimony. Although the trial court was not concerned about the fights Hartsfield had while at Patton, "this pedophilic disorder is a big deal." The court said that Hartsfield had done amazingly well in treatment, but it was "so problematic when he's in this situation living in this facility for such a long time to not engage in treatment that it causes me grave concern. It causes me to believe that there is such a profound unwillingness to examine this." His unwillingness "to even address it, I find to be consistent with someone who is a substantial danger to society." The trial court therefore found beyond a reasonable doubt that Hartsfield, by reason of a severe mental disorder, represents a substantial danger of physical harm to others. Accordingly, the trial court sustained the petition and extended Hartsfield's commitment to July 5, 2025.

### B. *Analysis*

Hartsfield contends that the trial court's finding that he posed a substantial danger of physical harm to others lacks substantial evidence that he has an "enduring [pedophilic] disorder." We disagree.

15

" ' "Whether a defendant 'by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others' under section 1026.5 is a question of fact to be resolved with the assistance of expert testimony." [Citation.] "In reviewing the sufficiency of evidence to support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt. [Citations.]" [Citation.]' [Citation.] A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5." (*People v. Bowers* (2006) 145 Cal.App.4th 870, 878–879.) While a single expert opinion may be sufficient to constitute substantial evidence to support recommitment, the opinion cannot be based on a " ' "guess, surmise or conjecture, rather than relevant, probative facts." ' " (*In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1504.) To establish the substantial danger of physical harm element, the prosecution must prove beyond a reasonable doubt that the person has, " 'at the very least, serious difficulty controlling his [or her] potentially dangerous behavior.' " (*People v. Redus* (2020) 54 Cal.App.5th 998, 1010; *People v. Williams* (2015) 242 Cal.App.4th 861, 872.)

Here, Drs. Maurer and Chen testified that pedophilic disorder and schizoaffective disorder were Hartsfield's primary diagnoses. Hartsfield's expert witness, Dr. Smith, did not testify that the pedophilic diagnoses was incorrect. Instead, she did not know that he had been diagnosed with that disorder, despite it being in his medical records. Thus, contrary to Hartsfield's claim

16

there is no evidence he has an "enduring" pedophilic disorder, there is more than sufficient evidence to support that diagnosis.

Hartsfield also argues that there is insufficient evidence he is a substantial danger to the public because of any pedophilic disorder. He thus cites the absence of evidence he has been involved in sexual incidents during his approximate 18 years at Patton. But where a defendant such as Hartsfield lacks access to children due to the structured environment, the absence of overt manifestations of sexual deviance does not necessarily establish he no longer suffers from a mental disorder that makes him a danger to others. (*People v. Sumahit* (2005) 128 Cal.App.4th 347, 353.) Rather, an assessment of whether he is likely to reoffend if released into society at large "must include consideration of his past behavior, his attitude toward treatment and other risk factors applicable to the facts of his case." (*Ibid.*)

Here, the crimes for which Hartsfield pled not guilty by reason of insanity involved his friend's 10-year-old sister. While staying at his friend's house, Hartsfield was discovered on top of the sleeping victim with his pants and the victim's underwear down. Thus, he has been prescribed sex offender treatment at Patton. However, during the more than 18 years he has been at Patton, Hartsfield has denied he has pedophilic disorder, said he did not commit the offenses, and refused to attend treatment programs. Such refusal to undergo treatment is "potent evidence" that a defendant is unprepared "to control his untreated dangerousness by voluntary means." (*People v. Sumahit*, *supra*, 128 Cal.App.4th at p. 354; accord, *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 928–929 [key factor in determining whether a person should be kept in medical

confinement is person's progress in mandatory treatment programs].)

And although the trial court did not rely on Hartsfield's assault on a peer, that incident nonetheless supports the finding that Hartsfield lacks control over his actions. The incident occurred within a year of the recommitment hearing. Hartsfield attacked his peer merely because Hartsfield thought the peer was staring at him. Hartsfield also told Dr. Chen that he had other fights with people because he feels the need to defend himself. Dr. Chen thus expressed concern that he had a history of misinterpreting his environment, resulting in violent behavior.

Moreover, various reports, including one authored by Dr. Souza, referenced incidents of Hartsfield masturbating in front of nonconsenting women at the hospital. Although the trial court did not reference these incidents in its ruling, they too show that Hartsfield cannot control his sexually deviant behavior and poses a substantial risk of harm to others.

And, as Drs. Maurer and Chen testified, Hartsfield's refusal to attend prescribed sex offender treatment programs reflects a lack of insight. Dr. Watson further testified that if probed on the commitment offenses, Hartsfield would become irritated and shut down. Such refusal to meaningfully engage with doctors or treatment in connection with the very reason he was committed and a lack of insight can support a finding of continued dangerousness. (See, e.g., *People v. Williams*, *supra*, 242 Cal.App.4th at p. 875 [defendant's lack of violence in confinement was not substantial evidence he could control violent impulses when he refused to take steps to prevent relapse into substance abuse]; *People v. Sudar* (2007) 158 Cal.App.4th 655, 663–664 [defendant suffered from same delusion that was in

18

effect when he committed arson offense that led to his institutionalization, "and consistently maintained that he would do the same thing in the same circumstances"].)

We conclude that substantial evidence supports the trial court's recommitment order.

## DISPOSITION

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ADAMS, J.

HANASONO, J.

19